UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

COREY GORDON, JOSEPH CADORE, ALLISON          :
MATHLIN, and JOSEPH MINICOZZI,                 :
                                               :
                         Plaintiffs,           :        REPORT AND
                                               :        RECOMMENDATION
      -against-                                :
                                               :        No. 21-CV-259-WFK-JRC
APS CONTRACTORS INC. and WILLIAM DOE,          :
                                               :
                         Defendants.           :
------------------------------------------------------------------x

JAMES R. CHO, United States Magistrate Judge:

## Introduction

Plaintiffs Corey Gordon, Joseph Cadore, Allison Mathlin, and Joseph Minicozzi

(collectively, "plaintiffs")[1] filed this employment discrimination action against their former

employer, defendant APS Contractors Inc. ("APS"), and their former supervisor, William Doe,[2]

(collectively, "defendants") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e ("Title VII"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law

§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code

§ 8-107.  *See generally* Am. Compl., Dkt. 22.  Currently pending before this Court, on a referral

from the Honorable William F. Kuntz, II, is plaintiffs' motion for default judgment.  *See* Order

Referring Motion dated September 14, 2023; Motion for Default Judgment, Dkt. 28.  For the

---

[1] On May 15, 2023, plaintiff Richard Billingsley voluntarily dismissed his claims.  *See* Dkt. 24.

[2] It does not appear from the record that plaintiffs have served defendant William Doe with the
summons and complaint, nor was a certificate of default entered as to this defendant.  Plaintiffs'
motion seeks judgment only against the corporate defendant APS.  Thus, since plaintiffs have not
pursued the claims against him, the Court recommends dismissing the claims against defendant
William Doe.  *See GEICO v. Wellmart RX, Inc.*, No. 19-CV-4414, 2022 WL 17774929, at *13
n.10 (E.D.N.Y. June 24, 2022); *Payamps v. M & M Convenience Deli & Grocery Corp.*, No. 16-
CV-4895, 2019 WL 8381264, at *1 n.1 (E.D.N.Y. Dec. 9, 2019).

reasons set forth below, this Court respectfully recommends granting plaintiffs' motion.

## Background

Each plaintiff is skilled "in building construction and roofing." Am. Compl. ¶ 19. Plaintiffs "find work through a Union hall in which the Union representatives place Plaintiffs on a list, and when a project becomes available, the Local 8 Union notifies them of a job opening." *Id*. ¶ 18. In June 2019, plaintiffs were placed by their Local 8 Union with defendant APS. *See id.* ¶¶ 20, 27. From approximately June 2019 to October 2019, plaintiffs were employed to perform construction and roofing work by defendant APS, "at or near the Breukelen Houses worksite located on Williams Street, between Stanley Avenue and Farragut Road, in Brooklyn, New York 11236."[3] *Id*. ¶¶ 21, 27, 43, 46, 53, 61, 65, 71.

Plaintiffs allege that throughout their employment with APS they were "subjected to . . . a harassing work environment manifested by national origin and racial discrimination." *Id.* ¶ 22. Specifically, APS "engaged in a persistent pattern of removing the Plaintiffs from skilled positions, and reassigning their skilled positions to Latino origin employees." *Id.* ¶ 24. APS then reassigned plaintiffs to unskilled jobs in order to justify terminating their employment, in accordance with the "custom and practice . . . [of] terminating skilled union members as unproductive" when they are assigned unskilled jobs. *Id.* ¶ 25. However, this reassignment was simply a pre-textual justification for plaintiffs' "eventual layoff." *Id.* To further its discriminatory practices, APS used Spanish as the predominant language on the worksite "as a convenient and effective means . . . to systematically disadvantage [plaintiffs] and other non-

---

[3] In the Amended Complaint, plaintiff Minicozzi alleged that he started working for APS in July 2019. *See* Am. Compl. ¶ 53. However, in his declaration, Mr. Minicozzi avers that he was employed with APS starting in June 2019. *See* Minicozzi Decl. ¶ 2, Dkt. 28-7 at ECF page 14-16.

Latino employees," who did not speak Spanish. *Id.* ¶ 28. Defendants also gave preferential assignments to their Latino employees, regardless of whether they spoke Spanish. *Id.* ¶ 31.

<u>Corey Gordon</u>

Plaintiff Gordon is a black African American. *Id.* ¶ 3. Gordon alleges that from the start of his employment with APS in June 2019, defendants undermined his "ability to perform his duties as a roofer" and that "preferable and different treatment [was given] to Latino employees." *Id.* ¶ 36. The supervisor assigned Gordon to areas of the worksite that were inactive, with no work scheduled, and assigned Latino employees to "better work assignments." *Id.* ¶¶ 31-32. For example, Gordon is skilled in a particular liquid water proofing method that requires a significant amount of training. *Id.* ¶ 35. However, instead of assigning Gordon to liquid water proofing, the supervisor trained inexperienced Latino roofers to perform the task. *Id.*

On several occasions, Gordon requested that instructions be given to him in English. *Id.* ¶¶ 29, 31. On one of those occasions, the supervisor commented that Gordon was unusual because "he never saw a black person that wasn't lazy." *Id.* ¶ 30. In addition, although blueprints, which "inform roofers of the daily work to be completed," were posted in English, supervisors gave supplemental instructions, "which detailed and modified the blueprints," in Spanish. *Id.* ¶ 37. As Gordon neither speaks nor understands Spanish, he "inevitably [] performed his duties in a manner that did not comport to important detailed information communicated in the Spanish spoken supplemental instructions." *Id.* ¶ 38. On one such occasion, Gordon "secure[d] the installation inconsistent to the project's required installation method." *Id.* ¶ 40. For his error, Gordon was "scolded and ridiculed." *Id.* Gordon was "further instructed [] to leave if he could not perform the job as instructed in Spanish," and he was later assigned to an unskilled position. *Id.*

In October 2019, APS terminated Gordon based on the pretext that he was not completing productive assignments. *Id.* ¶¶ 43-44. However, Gordon did not receive meaningful assignments because the supervisor deliberately reserved those positions for Latino employees. *Id.* ¶ 45.

Joseph Cadore

Plaintiff Cadore is a black African American. *Id.* ¶ 4. Cadore alleges that "despite his skill set and seniority being significantly [superior to many] of the Latino" employees, he was "virtually always assigned to trash collection." *Id.* ¶ 69. Cadore alleges that he was terminated on the ground that his services were not needed as a pretext for discrimination based on his non-Latino national origin. *Id.* ¶ 70.

Allison Mathlin

Plaintiff Mathlin is a black African American. *Id.* ¶ 5. Mathlin alleges that he was assigned "to portions of the Workplace that were inactive with the purpose of minimizing [his] productivity." *Id.* ¶ 64. "After multiple hours of being inactive," like Cadore, defendants assigned Mathlin to "trash collection, an unskilled job assignment, thereby effectuating the Supervisor's intent to minimize contribution[s] by non-Latino [] employees." *Id.* Ultimately, Mathlin was terminated because of his national origin. *See id.* ¶ 71.

Joseph Minicozzi

Plaintiff Minicozzi is white and of Italian ancestry. *Id.* ¶ 6. From the outset of his employment, defendants gave preferential treatment to Latino employees. *Id.* ¶ 54. Minicozzi was instructed by his supervisor to "teach the Spanish-[speaking] employees the skilled job of roof-rolling." *Id.* ¶ 55. However, even though Minicozzi informed his supervisor that he could speak only English, the supervisor directed Minicozzi "to do so anyway." *Id.* After failing to

4

perform the task as instructed, defendants assigned Minicozzi to "the unskilled job of trash collection." *Id.* Defendants further exploited Minicozzi's failure to train the Spanish-speaking employees as a pretext to assign the roof-rolling instruction assignment to Latino employees. *Id.* ¶ 57. In fact, on numerous occasions, Minicozzi was removed from skilled assignments and replaced with less-trained Latino employees. *Id.* ¶ 58. Defendants' termination of Minicozzi for not receiving productive assignments was just a pretext for discrimination because of his non-Latino national origin and race. *Id.* ¶ 60.

**Procedural History**

On March 2, 2020, plaintiffs filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC"), and on January 14, 2021, the EEOC issued a right to sue letter to plaintiffs. Am. Compl. ¶¶ 15-16. On January 21, 2021, plaintiffs commenced this action. *See* Compl., Dkt. 2. On February 25, 2021, plaintiffs effected service on APS through the New York Secretary of State. *See* Dkt. 7.

After defendant APS failed to answer or otherwise respond to the Complaint, on June 14, 2021, plaintiffs requested a certificate of default. *See* Dkt. 8. On June 22, 2021, the Clerk of Court entered default against APS. *See* Dkt. 10. On November 12, 2021, plaintiffs moved for default judgment. *See* Dkt. 11. After holding a motion hearing, at which defendants failed to appear, on May 5, 2022, Judge Kuntz referred plaintiffs' motion to this Court for a report and recommendation. *See* Order dated May 5, 2022, Dkt. 15. On June 15, 2022, this Court denied plaintiffs' first motion for default judgment for failure to comply with the Local Civil Rules and granted leave to refile the motion in a manner that complied with all applicable rules. *See* Order dated June 15, 2022.

On July 15, 2022, plaintiffs refiled their motion for default judgment, Dkt. 16 ("second

motion for default judgment"), and on December 2, 2022, Judge Kuntz referred plaintiffs'

second motion for default judgment to the undersigned for a report and recommendation, Dkt.

17.  On January 10, 2023, this Court held a hearing on plaintiffs' second motion for default

judgment, for which defendant APS failed to appear.  *See* Minute Entry dated January 10, 2023.

On March 20, 2023, this Court denied plaintiffs' motion for default judgment for failure to serve

the motion on defendant.  *See* Memorandum and Order dated March 20, 2023, Dkt. 20.  In

addition, the Court identified certain deficiencies in the allegations contained in plaintiffs'

complaint.  *See id.*

In response, on April 12, 2023, plaintiffs filed an Amended Complaint.  *See* Dkt. 22.

Plaintiff again served APS through the New York Secretary of State.  *See* Dkt. 23.  On May 22,

2023, plaintiffs requested a Certificate of Default.[4]  *See* Dkt. 27.  The instant motion followed,

which Judge Kuntz referred to the undersigned on September 14, 2023.  *See* Dkts. 28, 29.  On

September 26, 2023, this Court directed plaintiffs to supplement their motion to address their

claim for punitive damages.  *See* Order dated Sept. 26, 2023.  On October 9, 2023, plaintiffs filed

a supplement to their motion.  *See* Dkt. 31.  Counsel has mailed APS copies of the Amended

Complaint, plaintiffs' motion for default judgment, the supplemental papers, and the Court's

scheduling orders.  *See* Declaration of Joshua Gittleman ("Gittleman Decl.") ¶ 10, Dkt. 28-1;

---

[4] Default was entered against defendant APS on the Amended Complaint on January 12, 2024.
*See* Dkt. 36.  Even though the Clerk's certificate of default was not attached to the instant motion
pursuant to Local Civil Rule 55.2(b), since plaintiffs otherwise complied with Local Civil Rule
55.1(a) by requesting a certificate of default, the Court declines to deny the motion for default
judgment because plaintiffs did not cause the delay in the issuance of the certificate of default.
*See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (holding that "[a] district court
has broad discretion to determine whether to overlook a party's failure to comply with local
court rules"), *abrogated on other grounds*, *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009).

Dkt. 28-5; Dkt. 30; Dkt. 31 at ECF page[5] 4; Dkt. 33, Dkt. 34.  To date, APS has failed to respond to the motion or appear at any of the motion hearings.

## Discussion

### I.    Liability

#### A.    Default Judgment Standard

Rule 55 of the Federal Rules of Civil Procedure governs motions for default judgment. The Rule sets forth a two-step process for entry of a default judgment.  *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95-96 (2d Cir. 1993).  First, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case.  *See id.*; *see also* Fed R. Civ. P. 55(a) (providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default").  This first step is nondiscretionary.  *See United States v. Conolly*, 694 F. App'x 10, 12 (2d Cir. 2017).  Second, after the Clerk of Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the plaintiff may apply to the court for a default judgment.  *See* Fed. R. Civ. P. 55(a), (b)(2).

Here, the Clerk of the Court entered a default against defendants, after defendants failed to respond to both the original Complaint and Amended Complaint.  *See* Dkts. 10, 36; *see also* footnote 4, above.  To date, defendants have not appeared or moved to vacate the entry of default.

When evaluating a plaintiff's application for a default judgment, "a court is required to

---

[5] References to the page numbers generated by the Court's electronic case filing system appear as "ECF page."

accept all [] factual allegations as true and draw all reasonable inferences in [plaintiff's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). "Nevertheless, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *Labarbera v. ASTC Labs., Inc.*, 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010) (internal quotations and citations omitted); *see also TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd.*, 536 F. App'x 45, 46 (2d Cir. 2013) ("[P]rior to entering default judgment, a district court is required to determine whether the plaintiff's allegations establish the defendant's liability as a matter of law.") (internal quotations and citations omitted).

"Default judgments are 'generally disfavored and are reserved for rare occasions.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 129 (2d Cir. 2011) (quoting *Enron Oil*, 10 F.3d at 96). Providing guidance as to when a default judgment is appropriate, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it should only be entered as a last resort. *See Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "afford[] litigants a reasonable chance to be heard." *Enron Oil*, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," doubts should be resolved in favor of the defaulting party. *See id.* Accordingly, a plaintiff is not entitled to a default judgment as a matter of right simply because a defendant is in default. *See Erwin DeMarino Trucking Co. v. Jackson*, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

A default serves as the defendant's admission that the complaint's well-pleaded factual

allegations are true. *See Mickalis Pawn Shop*, 645 F.3d at 137; *Finkel*, 577 F.3d at 84 (after default the "court is required to accept all of the [plaintiff's] [well-pleaded] allegations as true and draw all reasonable inferences in its favor."). A fact is not considered "well-pleaded," however, "if it is inconsistent with [the] other allegations of the complaint or with facts of which the court can take judicial notice, or is contrary to uncontroverted material in the file of the case." *Hop Hing Produces Inc. v. Lin Zhang Trading Co., Inc.*, No. 11-CV-03259, 2013 WL 3990761, at *3 (E.D.N.Y. Aug. 5, 2013) (internal quotations and citations omitted). Ultimately, whether to grant a motion for default judgment is "left to the [court's] sound discretion." *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999); *Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593, 606 (E.D.N.Y. 2017).

Here, APS did not respond to the Amended Complaint despite proper service. Plaintiffs filed affidavits confirming service of the motion for default judgment and this Court's order scheduling a hearing on the motion. *See* Gittleman Decl. ¶ 10, Dkts. 28-1, 28-5, 30, 31, 33, 34. APS has nonetheless failed to respond to plaintiffs' motion for default judgment or otherwise appear in this action. Accordingly, this Court recommends finding that APS's failure to answer or otherwise respond to the Amended Complaint constitutes an admission of the factual allegations therein, and now proceeds to consider whether those facts establish APS's liability under federal, state and local law.

### B.    Discrimination Claims

Plaintiffs allege that defendants unlawfully discriminated against them by wrongfully terminating their employment on the basis of their race and national origin and subjecting them

to a hostile work environment under Title VII, the NYSHRL, and the NYCHRL.[6]  *See, e.g., Am. Compl.* at 1, ¶¶ 22-26, 62, 66, 71, 72.  Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the NYSHRL provides that "[i]t shall be an unlawful discriminatory practice [f]or an employer," on account of an individual's race or national origin, "to discharge from employment" or to "discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law. § 296(1)(a).  Most of the substantive standards that govern claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination under the NYSHRL.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  Thus, the Court considers plaintiffs' Title VII and NYSHRL claims in tandem.  *See Smith v. Xerox Corp.*, 196 F.3d 358, 372 n.1 (2d Cir. 1999).

On the other hand, the NYCHRL was intended to be construed more broadly than its state and federal counterparts.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013); *see also Spires v. MetLife Grp., Inc.*, No. 21-2014, 2023 WL 545350, at *1 (2d Cir. Jan. 27, 2023).  If plaintiffs meet the requisite elements of their claims under Title VII or the NYSHRL, then they have also met the standard under the NYCHRL.  *See Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020).

## 1.    Disparate Treatment

"Employment discrimination claims brought under Title VII, . . . and the NYSHRL are

---

[6] Plaintiffs' memorandum of law contains several stray references to 42 U.S.C. § 1981.  *See* Pls.' Mem. at 5, 6, 7, 9, Dkt. 28-6.  However, plaintiffs did not plead a claim under section 1981 in the Amended Complaint.

analyzed pursuant to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)." *Spires v. MetLife Grp., Inc.*, No. 18-CV-4464, 2019 WL 4464393, at *4 (S.D.N.Y. Sept. 18, 2019); *see Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (applying the *McDonnell Douglas* framework to Title VII claims); *McGill v. Univ. of Rochester*, 600 F. App'x 789, 790 (2d Cir. 2015) (applying *McDonnell Douglas* framework to claims brought under Title VII and the NYSHRL).  Under the *McDonnell Douglas* framework, to establish a *prima facie* showing of disparate treatment, a plaintiff must assert four necessary elements:  "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation[.]" *Littlejohn*, 795 F.3d at 307.  "[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination . . . , it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (internal citations and quotations omitted); *see Littlejohn*, 795 F.3d at 311.  Specifically, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311.  The plaintiff's burden at the prima facie stage is "minimal." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012).

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action.

11

*See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).  Finally, if the defendant makes such a showing, the plaintiff then has an opportunity to show that the proffered reason was not the true reason for the employment decision.  *See id.* at 507-08.  The plaintiff must present evidence that "supports a sufficient rational inference of discrimination."  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  Typically, however, because "[e]mployers are unlikely to leave a 'smoking gun' admitting a discriminatory motive," *see Kallinikos v. New York State Dep't of Corr. & Cmty. Supervision*, 481 F. Supp. 3d 76, 85 (E.D.N.Y. 2020) (citation omitted), the Court must carefully "review the record 'taken as a whole.'"  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).

Here, plaintiffs allege discriminatory treatment resulting in their wrongful termination. Specifically, plaintiffs Gordon, Cadore, and Mathlin are black African Americans and plaintiff Minicozzi is white and of Italian ancestry.  Therefore, each plaintiff belongs to a protected class. *See Village of Freeport v. Barrella*, 814 F.3d 594, 608-09 (2d Cir. 2016) (finding that white police officer of Italian ancestry stated claim for racial discrimination under Title VII as non-Hispanic and opining that a claim of discrimination "based on Hispanic ethnicity or lack thereof may also be cognizable under the rubric of national-origin discrimination, depending on the particular facts of each case").  Since plaintiffs were placed with APS by their Union, and they allege that they are "skill[ed] in building construction and roofing," the Court infers that they were qualified for their jobs.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("plaintiff must show only that he possesses the basic skills necessary for performance of [the] job") (internal quotation marks and citation omitted).  Further, plaintiffs suffered an adverse employment action when defendant APS terminated their employment.

Finally, plaintiffs allege that they were treated differently than Latino employees because

plaintiffs were removed from their skilled positions, those skilled positions were reassigned to Latino employees, plaintiffs were instead assigned to unskilled jobs, and then plaintiffs were terminated pretextually for failing to fill skilled job roles.  Defendant APS used plaintiffs' inability to speak Spanish as an excuse to assign plaintiffs to less active areas of the worksite and unskilled tasks.  In fact, Gordon's supervisor made a bigoted comment directed at Gordon's race when Gordon asked that instructions be provided in English.  *See* Am. Compl. ¶ 30 ("Supervisor [William] commented that Gordon was out of the ordinary because 'he never saw a black person that wasn't lazy.'").  Taken as a whole, the facts alleged by plaintiffs give rise to an inference of race and national original discrimination.  *See Quintero v. Angels of the World, Inc.*, No. 19-CV-6126, 2021 WL 4464123, at *5 (E.D.N.Y. Sept. 10, 2021), *report and recommendation adopted*, 2021 WL 4463488 (E.D.N.Y. Sept. 29, 2021).  Since plaintiffs have alleged facts sufficient to establish a *prima facie* case of discrimination on the basis of race and national origin, the burden shifts to defendant APS to present a legitimate, non-discriminatory reason for the terminations.  Since defendant defaulted, it has not rebutted plaintiffs' prima facie case, which creates a "presumption that the employer unlawfully discriminated against the employee."  *St. Mary's Honor Ctr.*, 509 U.S. at 506; *Quintero,* 2021 WL 4464123, at *5; *see, e.g., Taylor v. New York City Fresh Mkt.*, No. 19-CV-4797, 2020 WL 10356230, at *7 (E.D.N.Y. Dec. 23, 2020), *report and recommendation adopted*, 2021 WL 2940832 (E.D.N.Y. July 13, 2021).

### 2.    Hostile Work Environment

A hostile work environment is one form of disparate treatment that is prohibited under Title VII and the NYSHRL.  *See Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001); *see also Feingold v. New York*, 366 F.3d 138, 149, 152 (2d Cir. 2004).  "To state a claim for hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the

complained of conduct:  (1) 'is objectively severe or pervasive -- that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [race].'"  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (*per curiam*) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)); *see Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020).  "For liability to attach, the employer must also be responsible for the conduct at issue."  *Gregory*, 243 F.3d at 692 n.3.  The same substantive standards also apply to hostile work environment claims arising under the NYSHRL.[7]  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014); *Setty v. Fitness*, No. 17-CV-06504, 2018 WL 8415414, at *5 (E.D.N.Y. Dec. 18, 2018), *report and recommendation adopted*, 2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019).

"In considering whether a plaintiff has met this burden, courts should examin[e] the totality of the circumstances, including:  the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance."  *Rivera*, 743 F.3d at 20 (citation and internal quotation marks omitted).  Ordinarily, a race-based hostile work environment claim must involve "'more than a few isolated incidents of racial enmity[.]'"  *Williams v. Cnty. of Westchester*, 171 F.3d 98, 100-01 (2d Cir. 1999) (*per curiam*) (quoting *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1103 (2d Cir. 1986)).  "An employer violates Title VII when the

---

[7] On October 11, 2019, amendments to the NYSHRL came into effect that eliminated the "severe and pervasive" standard.  Under the new standard, a plaintiff must allege that they were subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more . . . protected categories."  N.Y. Exec. Law § 296(1)(h).  Because plaintiffs were discharged prior to October 11, 2019, the Court applies the federal standard to their NYSHRL hostile work environment claim.

'workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ramsy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020). An isolated incident can, however, constitute a hostile work environment if it is sufficiently severe. *See Feingold*, 366 F.3d at 150. "Otherwise, a plaintiff must show a series of incidents that were 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-7114, 2017 WL 9487194, at *6 (E.D.N.Y. Aug. 23, 2017) (quoting *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 446-47 (E.D.N.Y. 2013)), *report and recommendation adopted*, 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017). Moreover, the conduct of plaintiffs' supervisor is automatically imputed to the employer under Title VII. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010).

Here, the Amended Complaint mentions only one instance of a derogatory comment: "Supervisor [William] commented that Gordon was out of the ordinary because 'he never saw a black person that wasn't lazy.'" Am. Compl. ¶ 30. Nevertheless, plaintiffs allege that defendant APS engaged in a pattern of harassment and disparate treatment against them throughout their employment based on their race or national origin. They allege that defendants refused their frequent requests to provide instructions in English undermining their ability to perform their jobs, used plaintiffs' inability to speak Spanish as an excuse to assign them to unskilled tasks, and treated Latino employees better than they treated plaintiffs. For example, the supervisor "scolded and ridiculed Mr. Gordon in front of the other roofers . . .[and] further instructed Mr. Gordon to leave if he could not perform the job as instructed in Spanish." Am. Compl. ¶ 40. The Court finds that the working conditions were such that a reasonable person would have

found the conduct abusive and plaintiffs subjectively found the conduct abusive and hostile.

Under the totality of the circumstances, the Court finds that plaintiffs were subject to a hostile

work environment in that defendant "made it difficult or impossible [to do their jobs] effectively

in a variety of ways." *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21-CV-2512,

2022 WL 524551, at *7-*8 (S.D.N.Y. Feb. 22, 2022); *see Pucino v. Verizon Wireless Commc'ns,

Inc.*, 618 F.3d 112, 115 (2d Cir. 2010) (finding that "[w]ork assignments, the provision of tools,

the use of a bucket truck, [and] the issues as to use of restrooms" altered working conditions);

*Spence v. Bukofzer*, No. 15-CV-6167, 2017 WL 1194478, at *8 (S.D.N.Y. Mar. 30, 2017)

(allegations that plaintiff was excluded from work meetings, received unfavorable assignments,

and was demoted described "objectively hostile work environment"); *Vaigasi v. Solow Mgmt.

Corp.*, No. 11-CV-5088, 2014 WL 1259616, at *3, *11 (S.D.N.Y. Mar. 24, 2014) (denying

motion to dismiss hostile work environment claim where plaintiff alleged that he "was treated

'less well' than younger, less qualified employees" and provided examples, such as inequitable

distribution of overtime opportunities and work assignments).

   In sum, plaintiffs have stated claims for disparate treatment and hostile work environment

under Title VII and the NYSHRL. *See Accely v. Consol. Edison Co. of N.Y., Inc.*, No. 19-CV-

5984, 2022 WL 973415, at *5 (S.D.N.Y. Mar. 31, 2022) (the same standard applies under the

NYSHRL for imputing supervisor's conduct to the employer). In addition, because plaintiffs

have adequately asserted claims under Title VII and the NYSHRL, they have also sufficiently

alleged claims under the NYCHRL. *See Mondelo*, 2022 WL 524551, at *10; *Quintero*, 2021

WL 4464123, at *7.

## II. Damages

   A party's default "is not considered an admission of damages." *Greyhound*

*Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)).  Accordingly, the court must conduct an inquiry sufficient to determine the extent of damages to a "reasonable certainty."  *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).  A court may make this determination based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence.  *See* Fed. R. Civ. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991).

Plaintiffs seek an award of damages in the form of back pay, emotional distress and punitive damages.[8]  *See* Dkt. 28-8 at ECF pages 1, 12; Proposed Default Judgment, Dkt. 28-9.

Violations of Title VII, the NYSHRL and the NYCHRL "entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering."  *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 92 (E.D.N.Y. 2020) (internal quotation marks and citation omitted); *see Santiago v. Crown Heights Ctr. for Nursing and Rehab.*, No. 15-CV-4381, 2017 WL 9482107, at *23 (E.D.N.Y. Feb. 24, 2017) ("Courts have awarded damages for emotional distress under Title VII, . . . the NYSHRL and the NYCHRL."), *adopted as modified*, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017).  "Victims of employment discrimination are entitled to reasonable damages that would make the plaintiff 'whole for injuries suffered on account of unlawful employment discrimination.'"  *Antoine*, 489 F. Supp. 3d at 92 (citation omitted).  Title VII limits compensatory and punitive damages, excluding back pay, to $50,000 for employers that have one hundred or fewer employees.  *See* 42 U.S.C. § 1981a(b)(3)(A).  The NYCHRL has

---

[8] Although plaintiffs mention front pay in their memorandum of law, *see* Pl. Mem. at 19, Dkt. 28-6, they have not requested an award of front pay, *see* Proposed Default Judgment, Dkt. 28-9; Summary of Damages, Dkt. 28-8 at ECF page 12.  In any event, the Court concludes that the back pay award recommended adequately redresses the loss that plaintiffs are reasonably likely to have suffered.  *See Quintero*, 2021 WL 4464123, at *14.

no limit on the amount of damages to be awarded.  *See* N.Y.C. Admin. Code § 8-502(a).

### A.     Back Pay

When a defendant has violated Title VII, a court may award back pay, 42 U.S.C.

§ 2000e-5(g)(1), and such an award "is the rule, not the exception."  *Carrero v. N.Y. City Hous.*

*Auth.*, 890 F.2d 569, 580 (2d Cir. 1989).  Back pay is also available under the NYSHRL and the

NYCHRL, according to the same standards as Title VII.  *See Garcia v. Comprehensive Ctr.,*

*LLC*, No. 17-CV-8970, 2019 WL 8274296, at *5 (S.D.N.Y. Nov. 21, 2019), *report and*

*recommendation adopted*, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020); *Manswell*, 2017 WL

9487194, at *15; N.Y. Exec. Law § 297(9); N.Y.C. Admin. Code § 8-502(a).  The purpose of a

back pay award is to "make persons whole for injuries suffered through past discrimination[.]"

*Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996) (citation omitted).  Back pay is

calculated from the date of the discriminatory practice to the date of entry of judgment.  *See*

*Sands v. Runyon*, 28 F.3d 1323, 1327 (2d Cir. 1994).

An employee who is discharged in violation of Title VII has an obligation to attempt to

mitigate damages by using reasonable diligence in finding other employment.  *See Bergerson v.*

*N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 526 F. App'x 109, 111 (2d Cir.

2013).  Typically, back pay is calculated as "the wages the employee would have earned from

the date of discharge to the date of reinstatement, along with lost fringe benefits such as vacation

pay and pension benefits[.]"  *United States v. Burke*, 504 U.S. 229, 239 (1992); *Noel v. N.Y. State*

*Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 697 F.3d 209, 213 (2d Cir. 2012).  Where,

as here, reinstatement is not requested, the plaintiff's entitlement to back pay is generally

reduced or eliminated when she obtains, or could have obtained, employment elsewhere.  *See* 42

U.S.C. § 2000e-5(g)(1) ("[i]nterim earnings or amounts earnable with reasonable diligence . . .

shall operate to reduce the back pay otherwise allowable").

Each plaintiff has submitted a declaration, which describes the amount he was paid while employed by defendant, avers that he searched for employment following his termination by defendant, and notes the length of the period of his unemployment following his termination. Since APS has defaulted, it has not disputed plaintiffs' claims or submitted any contrary evidence. Accordingly, the Court finds that plaintiffs have presented adequate information upon which to recommend an award of back pay damages for the period postdating each plaintiffs' employment with APS.

Each plaintiff requests an award of back pay based on an hourly wage of $43.50 for a regular workweek of 35 hours per week or $1,522.50 per week. The Court recommends awarding plaintiffs back pay in the amount of $1,522.50 per week as set forth in the table below.

| Plaintiff | Number of weeks unemployed | Back pay award |
|---|---|---|
| Joseph Minicozzi | 4[9] | $6,090.00 |
| Joseph Cadore | 26 | $39,585.00 |
| Corey Gordon | 130[10] | $197,925.00 |
| Allison Mathlin | 17[11] | $25,882.50 |

---

[9] Although Minicozzi avers that he worked for defendant until October 7, 2019, and "was finally hired for another roofing job" in December 2019, *see* Minicozzi Decl. ¶¶ 2, 19, Dkt. 28-7 at ECF pages 14-16, he seeks a back pay award for only four weeks, *see* Dkt. 28-8 at ECF page 1.

[10] Like Minicozzi, Gordon appears to seek a back pay award for fewer weeks than he was unemployed. *Compare* Gordon Decl. ¶¶ 2, 18, Dkt. 28-7 at ECF pages 7-9 (stating that he was unemployed from October 7, 2019 until May 2022), *with* Dkt. 28-8 at ECF page 1 (calculating back pay based on 130 weeks).

[11] As to Mathlin, plaintiffs calculated damages based on 30 weeks of unemployment. *See* Dkt. 28-8 at ECF page 1; *see also* Mathlin Decl. ¶¶ 2, 13, Dkt. 28-7 at ECF pages 12-13 (describing his period of unemployment as encompassing "seven months"). However, the Court estimates that the period between October 7, 2019 and February 2020 is approximately 17 weeks.

| Total | | $269,482.50 |
| --- | --- | --- |

### B.    Pre-judgment Interest on Back Pay Award

Plaintiffs also request pre-judgment interest on their back pay damages award. *See* Proposed Judgment, Dkt. 28-9. Where the damages awarded to a plaintiff represent compensation for lost wages, "it is ordinarily an abuse of discretion not to include pre-judgment interest." *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998) (internal quotation marks and citation omitted). An award of pre-judgment interest on plaintiffs' back pay award is appropriate here, "because it serves to compensate the plaintiff[s] for loss of the use of money wrongfully withheld" due to defendants' discrimination. *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 264 (S.D.N.Y. 2007) (citation omitted); *see Gutierrez v. Taxi Club Mgmt., Inc.*, No. 17-CV-532, 2018 WL 3432786, at *12 (E.D.N.Y. June 25, 2018), *report and recommendation adopted*, 2018 WL 3429903 (E.D.N.Y. July 16, 2018). Although courts have the discretion to determine the appropriate rate of pre-judgment interest in a back pay award, *see McIntosh v. Irving Tr. Co.*, 873 F. Supp. 872, 882 (S.D.N.Y. 1995), where "a judgment is based on violations of both federal and state law, courts in this circuit uniformly have applied a federal interest rate, most commonly based on the average rate of return on one-year Treasury bills ('T-bills') for the relevant time period." *Rodriguez v. Express World Wide, LLC*, No. 12-CV-4572, 2014 WL 1347369, at *7 (E.D.N.Y. Jan. 16, 2014), *report and recommendation adopted*, 2014 WL 1350350 (E.D.N.Y. Mar. 31, 2014) (quoting *Thomas*, 508 F. Supp. 2d at 264); *see Antoine*, 489 F. Supp. 3d at 94; *Drice v. My Merchant Servs., LLC*, No. 15-CV-395, 2016 WL 1266866, at *7 (E.D.N.Y. Mar. 4, 2016), *report and recommendation adopted*, 2016 WL 1266948 (E.D.N.Y. Mar. 31, 2016). As plaintiffs' claims arose under both federal and state laws, the Court therefore recommends awarding plaintiffs pre-judgment interest compounded annually on their back pay award at the

federal interest rate.  *See Villalta v. JS Barkats, P.L.L.C.*, No. 16-CV-2772, 2021 WL 2458699, at *13 & n.11 (S.D.N.Y. Apr. 16, 2021), *report and recommendation adopted*, 2021 WL 2458023 (S.D.N.Y. June 16, 2021); *Joseph v. HDMJ Rest., Inc.*, 970 F. Supp. 2d 131, 152 (E.D.N.Y. 2013).  The Court further recommends calculating interest from the date of termination of each plaintiff (*i.e.*, October 7, 2019 (Cadore Decl. ¶ 2; Gordon Decl. ¶ 2; Mathlin Decl. ¶ 2; Minicozzi Decl. ¶ 2)) until the entry of judgment.  *See Antoine*, 489 F. Supp. 3d at 94-95 (awarding interest from date of constructive termination); *Rodriguez*, 2014 WL 1347369, at *7 n.6 (calculating interest from the last day of plaintiff's employment).

## C.    Emotional Distress Damages

"The Second Circuit sorts emotional distress claims into three categories of claims: 'garden-variety,' 'significant' or 'egregious.'"  *Cavalotti v. Daddyo's BBQ, Inc.*, No. 15-CV-6469, 2018 WL 5456654, at *27 (E.D.N.Y. Sept. 8, 2018) (quoting *Rainone v. Potte*r, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005)); *see Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536, 546 (2d Cir. 2020).  "For 'garden-variety' emotional distress claims, where plaintiff 'did not seek medical treatment but [ ] the evidence in the form of plaintiff's testimony describes shock, nightmares, sleeplessness, humiliation, and other subjective distress,' courts have awarded damages ranging from $5,000 to $35,000."  *Antoine*, 489 F. Supp. 3d at 96 (citations omitted); *see Sooroojballie*, 816 F. App'x at 546; *Munson v. Diamond*, No. 15-CV-425, 2017 WL 4863096, at *8 (S.D.N.Y. June 1, 2017) ("Garden variety emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $5,000 to $35,000 awards.") (internal quotation marks omitted), *report and recommendation adopted*, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017).  "Significant" emotional distress claims typically involve "substantial harm that is often corroborated by witnesses or is evidenced by medical

documents" and "[d]amages for this type of claim range from $50,000 to $100,000." *Francis v. Ideal Masonry, Inc.*, No. 16-CV-2839, 2018 WL 4292171, at *10 (E.D.N.Y. Aug. 3, 2018), *report and recommendation adopted,* 2018 WL 4288625 (E.D.N.Y. Sept. 7, 2018); *see Sooroojballie*, 816 F. App'x at 546 ("Significant emotional distress claims . . . may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses."). Finally, "[e]gregious emotional distress claims justifying awards exceeding $100,000 have only been warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected." *Cavalotti*, 2018 WL 5456654 at *27 (internal quotation marks and citation omitted); *see Sooroojballie*, 816 F. App'x at 546 (citation omitted). Courts in this District have recognized that the often-quoted emotional distress damages ranges must be adjusted for inflation. *See Antoine*, 489 F. Supp. 3d at 97 (as of August 2020, adjusting damages ranges to: "$6,550 to $46,000 for 'garden-variety' cases; $65,000 to $131,000 for significant" cases; and, above $131,000 in 'egregious cases'"); *Gutierrez*, 2018 WL 3432786, at *9.

"Important factors in assessing an appropriate amount to award for emotional suffering include the amount, duration, and consequences of the claimant's emotional distress." *Cavalotti*, 2018 WL 5456654, at *27 (quoting *Munson*, 2017 WL 4863096, at *8) (internal quotation marks omitted); *Tenecora v. Ba-kal Rest. Corp.*, No. 18-CV-7311, 2020 WL 8771256, at *19 (E.D.N.Y. Nov. 30, 2020), *report and recommendation adopted in part*, 2021 WL 424364 (E.D.N.Y. Feb. 8, 2021).

Plaintiffs request an award of $55,000 each for their emotional distress. *See* Pl. Mem. at 20, Dkt. 28-6. Plaintiff Cadore avers that defendants' conduct caused "severe emotional distress, . . . including nightmares, extreme fatigue[,] difficulty sleeping[,] and bouts of depression."

Cadore Decl. ¶¶ 5, 16, Dkt. 28-7 at ECF pages 1-3.  For plaintiff Gordon, the discrimination he suffered was "emotionally and psychologically devastating."  Gordon Decl. ¶ 14, Dkt. 28-7 at ECF pages 9-11.  He, too, suffers from "nightmares, extreme fatigue[,] difficulty sleeping[,] and bouts of depression."  *Id.* ¶ 17.  Plaintiff Mathlin had great difficulty sleeping and "completely lost [his] appetite and still struggle[s] with it today due to the wrongful termination."  Mathlin Decl. ¶¶ 8-10, 12, Dkt. 28-7 at ECF pages 12-13.  Plaintiff Minicozzi suffered from "headaches due to the stress of the termination and the anxiety in [his] new job" because he was afraid that he might again be subjected to discrimination.  *See* Minicozzi Decl. ¶ 11, Dkt. 28-7 at ECF pages 14-16.  Plaintiffs Gordon, Cadore and Minicozzi each submitted a corroborating declaration from a friend or relative attesting to having witnessed the plaintiff having suffered from emotional distress.  *See* Dkt. 28-7 at ECF pages 4-6, 10-11, 17.

Plaintiffs' allegations of emotional distress are significant, even though the allegations are not supported with any medical or mental health records, nor have plaintiffs alleged that they treated with any medical provider.  Based on plaintiffs' declarations and those of the corroborating witnesses, the requested award of **$55,000** is reasonable to compensate each plaintiff for his emotional distress and is consistent with awards to plaintiffs who suffered similar injuries (adjusted for inflation).[12]  *See Tenecora*, 2020 WL 8771256, at *20-*24 (awarding plaintiffs emotional damages for sexual harassment ranging from $4,00-$40,000); *Gutierrez*, 2018 WL 3432786, at *10 (recommending award of $130,000 for emotional distress even though "[p]laintiff's testimony was not corroborated, and [p]laintiff did not seek medical or psychiatric

---

[12] Using the same formula as the Court in *Antoine* and *Gutierrez*, as of January 2024, the upper range for garden variety emotional distress is approximately $54,000.  *See Antoine*, 489 F. Supp. 3d at 96 & n.11 (applying Bureau of Labor Statistics' Consumer Price Index ("CPI")); *Gutierrez*, 2018 WL 3432786, at *9 (same); CPI Inflation Calculator, https://bls.gov/data/inflation_calculator.htm.

treatment [where] her significant symptoms were felt during her employment and persisted after

her employment ended"); *Setty*, 2018 WL 8415414, at *18 (recommending award of $35,000

where plaintiff stated that the harassment made him feel "humiliated," hurt his relationship with

his girlfriend and family, and "took away [his] dignity," but where he submitted no medical or

mental health records showing he sought treatment); *Santiago*, 2017 WL 9482107, at *23

(plaintiff's statement that he experienced "anxiety, stress, shame and embarrassment, and loss of

self worth," supported an award for emotional distress damages in the amount of $30,000 even

though plaintiff did not seek treatment from any medical provider); *cf. Becerril v. E. Bronx

NAACP Child Dev. Ctr.*, No. 08-CV-10283, 2009 WL 2611950, at *2, *6 (S.D.N.Y. Aug. 18,

2009), *report and recommendation adopted*, 2009 WL 2972992, at *2-*3 (S.D.N.Y. Sept. 17,

2009) (awarding $50,000 for emotional distress where plaintiff was prescribed three

medications, diagnosed with depression, and suffered migraines and post-concussive syndrome).

### D.    Punitive Damages

Plaintiffs request an award of punitive damages in the amount of $25,000 each.  *See*

Supp. Decl. ¶ 2, Dkt. 31.  Title VII and the NYCHRL provide for punitive damages for a

prevailing party.  *See* 42 U.S.C. § 1981a(b)(1) (authorizing punitive damages under Title VII,

except against "a government, government agency or political subdivision"); *Luciano v. Olsten

Corp.*, 110 F.3d 210, 220-21 (2d Cir. 1997); *Tenecora*, 2020 WL 8771256, at *25 (punitive

"damages are available under Title VII"); *Antoine*, 489 F. Supp. 3d at 101 ("The NYCHRL, on

the other hand, imposes no limit on the amount of punitive damages a court may award.").

Under Title VII, a plaintiff may recover punitive damages if plaintiff demonstrates that the

defendant "engaged in a discriminatory practice or discriminatory practices with malice or with

reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C.

24

§ 1981a(b)(1); *see Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (punitive damages are appropriate only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others") (internal quotation marks and citation omitted); *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 384 (2d Cir. 2001). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535. "A plaintiff seeking punitive damages under Title VII must present evidence that (1) the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, *or* (2) that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." *Manswell*, 2017 WL 9487194, at *19 (citation omitted). Under the NYCHRL, a plaintiff is entitled to punitive damages where "the wrongdoer's actions amount to willful or wanton negligence or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 30 N.Y.3d 325, 329 (2017) (internal quotation marks and citation omitted).

Under the factors relevant to assessing "malice" or "reckless indifference," courts consider whether there was any violent conduct or threats of violence on the part of the employer, whether the defendant acted with deceit or malice rather than mere negligence, and whether there were repeated instances of misconduct. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

The Supreme Court has delineated several factors for courts to consider in assessing the reasonableness of punitive damages, including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the

plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases." *Antoine*, 489 F. Supp. 3d at 101 (citing *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09-CV-5378, 2011 WL 4549412, at *5 (S.D.N.Y. Sept. 27, 2011)); *see BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

The Court finds that defendant's conduct towards plaintiffs was not sufficiently egregious or outrageous to warrant punitive damages based on comparable cases. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 573 (2d Cir. 2011) (affirming district court's finding that an award of punitive damages was inappropriate where there was "little if any evidence of malice or reckless indifference or egregious or outrageous behavior"); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 236 (2d Cir. 2000) (plaintiff's allegations "support[] a finding of discrimination, [but] does not support a find that [the defendant] discriminated in the face of a perceived risk that its actions would violate federal law"); *Williams v. Firequench, Inc.*, No. 21-CV-4112, 2022 WL 3571752, at *8 (S.D.N.Y. Aug. 19, 2022) (denying punitive damages on discrimination claims under Title VII and NYCHR); *Miller v. E. Midwood Hebrew Day Sch.*, No. 19-CV-5580, 2021 WL 966166, at *8  (E.D.N.Y. Feb. 15, 2021) (recommending denying punitive damages), *report and recommendation adopted*, 2021 WL 965072 (E.D.N.Y. Mar. 15, 2021); *Santiago*, 2017 WL 9482107, at *24.  While plaintiffs allege claims of discriminatory behavior and a hostile work environment, plaintiffs have not established that defendants willfully, wantonly, recklessly, or consciously acted in violation of law.  APS's termination of plaintiffs does not implicate any violence or threats of violence, nor is there any evidence of deceit.  Thus, the Court recommends denying plaintiffs' request for punitive damages.

## III.    Attorneys' Fees

Plaintiffs have withdrawn their request for attorneys' fees.  *See* Supp. Decl. ¶ 8.

**Conclusion**

For the reasons set forth above, this Court respectfully recommends entering default judgment against defendant APS Contractors Inc. and dismissing the claims against defendant William Doe.  The Court recommends denying plaintiffs' request for punitive damages.  The Court further recommends awarding plaintiffs damages against APS Contractors Inc. as follows:

(1)  back pay to **Joseph Minicozzi** in the amount of **$6,090**, plus pre-judgment interest at the federal interest rate under 28 U.S.C. § 1961 from October 7, 2019 until the entry of judgment, and emotional distress damages in the amount of **$55,000**;

(2) back pay to **Joseph Cadore** in the amount of **$39,585**, plus pre-judgment interest at the federal interest rate under 28 U.S.C. § 1961 from October 7, 2019 until the entry of judgment, and emotional distress damages in the amount of **$55,000**;

(3) back pay to **Corey Gordon** in the amount of **$197,925**, plus pre-judgment interest at the federal interest rate under 28 U.S.C. § 1961 from October 7, 2019 until the entry of judgment, and emotional distress damages in the amount of **$55,000**; and

(4) back pay to **Allison Mathlin** in the amount of **$25,882.50**, plus pre-judgment interest at the federal interest rate under 28 U.S.C. § 1961 from October 7, 2019 until the entry of judgment, and emotional distress damages in the amount of **$55,000**.

A copy of this Report and Recommendation is being electronically served on counsel. Further, the Court directs plaintiffs' counsel to serve a copy of this Report and Recommendation, by overnight mail and first-class mail, on defendant and to file proof of service on ECF by **February 23, 2024**.  Any objections to the recommendations made in this Report must be filed with the Honorable William F. Kuntz, II within 14 days after the filing of this Report and Recommendation and, in any event, on or before **March 5, 2024**.  *See* 28 U.S.C. § 636(b)(1);

27

Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may waive the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*) (discussing waiver under the former ten-day limit).

**SO ORDERED**

Dated: Brooklyn, New York
       February 20, 2024

                    s/ James R. Cho
                    James R. Cho
                    United States Magistrate Judge